UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>       -v.-<br><br>GIBRON LOPEZ,<br><br>           Defendant.<br>_____<br><br>GIBRON LOPEZ,<br><br>           Movant,<br><br>       -v.-<br><br>UNITED STATES OF AMERICA,<br><br>           Respondent. | 16 Cr. 323-2 (KPF)<br><br>**OPINION AND ORDER**<br><br>21 Civ. 1858 (KPF) |

KATHERINE POLK FAILLA, District Judge:

In May 2012, Gibron Lopez conspired to rob a local drug dealer, Miles Klein, of the drugs and drugs proceeds Mr. Klein was then storing in his apartment. The plans for the robbery went awry, however, when Mr. Klein proved unwilling to submit to the robbers' demands; ultimately, Mr. Klein was beaten with a wrench and a mallet and dragged into his bathroom, where he succumbed to his injuries.

Mr. Lopez was convicted of Hobbs Act robbery offenses after a jury trial and sentenced to the statutory maximum term of 40 years' imprisonment. His conviction and sentence were then affirmed on appeal. Mr. Lopez now brings a motion to vacate, set aside, or correct his sentence. For the reasons set forth in the remainder of this Opinion, the Court denies the motion.

# BACKGROUND[1]

## A.    Factual Background

When Victor Monge met Judie Olivera in early 2011, he thought his life had been saved.  Mr. Monge was a small-scale drug dealer and member of the Latin Kings gang, but these affiliations had not prevented him from homelessness and poverty.  (Trial Transcript ("Tr.") 153-54, 159-61).  Mr. Monge would occasionally visit Ms. Olivera's home and smoke marijuana with Ms. Olivera and her then-husband; eventually, Ms. Olivera invited Mr. Monge to move into their apartment on Union Avenue in the Bronx.  (*Id.* at 164-66).  Over time, Ms. Olivera kicked her husband out of the apartment and invited Defendant Gibron Lopez, another small-scale drug dealer who became her romantic partner, to move in.  (*Id.* at 168-72).

In May 2012, Ms. Olivera broached with Mr. Monge the possibility of robbing still another small-scale drug dealer with whom she had had a prior sexual relationship — Miles Klein, whom she referred to as "Ace."  (Tr. 172-73).  Ms. Olivera suggested that Mr. Klein would have both drugs and money hidden in his apartment.  (*Id.*).  Some time thereafter, Ms. Olivera raised the subject again in a conversation with both Mr. Monge and Mr. Lopez, explaining

> [t]hat she wanted to rob, she wanted to rob Ace[,] that he had drugs and money.  She was going to let us know when it was going to take place, that if we was gonna rob him and basically that she's gonna go inside his

---

[1]    The Court refers to Mr. Lopez's opening brief in support of his Section 2255 motion as "Pet. Br." (Dkt. #154); to his counseled supplemental brief as "Pet. Supp. Br." (Dkt. #166); to the Government's omnibus opposition brief as "Gov't Opp." (Dkt. #171); and to Mr. Lopez's reply brief as "Pet. Reply" (Dkt. #174).  Unless otherwise specified, references to docket entries are to the docket in the criminal case, No. 16 Cr. 323 (KPF).

> house, basically, seduce him or whatever, that she is
> going to find out where the drugs and money was at and
> that she was gonna let us know and she is gonna come
> to the front door, unlock the front door and resume
> what she was doing and then we was gonna catch both
> of them by surprise.

(*Id.* at 174).  In other words, Messrs. Monge and Lopez would conduct the actual robbery, and would restrain Ms. Olivera along with Mr. Klein to conceal her involvement.  (*Id.* at 176).  Both men agreed to the plan.  (*Id.* at 177).

On May 12, 2012, the day of the robbery, the three conspirators had a final planning meeting in Ms. Olivera's apartment.  (Tr. 180).  Mr. Lopez came to the meeting prepared with a black bag containing two pairs of gloves, duct tape, and a wrench; Mr. Monge contributed a mallet and a bandanna.  (*Id.* at 181-83).  The three then smoked marijuana before taking the subway to Mr. Klein's apartment building.  (*Id.* at 187-89).  Ms. Olivera went inside the building, while the other two waited for her signal.  (*Id.* at 190-91).  Mr. Lopez received text updates from Ms. Olivera.  (*Id.* at 191-94).

After a few minutes, Messrs. Lopez and Monge entered the building and waited in a stairwell.  (Tr. 192-93).  When Mr. Lopez received the signal from Ms. Olivera, the two men put on gloves, covered their faces, readied their weapons, and proceeded to the apartment.  (*Id.* at 194).  Ms. Olivera opened the door, and the two men burst in and began beating Mr. Klein's head with their weapons.  (*Id.* at 196).[2]  Unbeknownst to them, however, Mr. Klein kept a replica sword near his front door and began to fight back.  (*Id.* at 196-97).

---

[2]     Mr. Klein immediately knew that Ms. Olivera had set him up.  (*See* Tr. 198).

Eventually, the two men were able to disarm Mr. Klein and restrain him with duct tape; Mr. Monge inserted his bandanna in Mr. Klein's mouth before taping it shut. (*Id.* at 198-99). While all of this was happening, Ms. Olivera ran to the back of the apartment; grabbed several items; and ran out after collecting the items in a black book bag. (*Id.*).

Messrs. Monge and Lopez dragged Mr. Klein to the bathroom, put him in the tub, and beat him some more; Mr. Monge turned on the water and closed the door to ensure that Mr. Klein's calls for help would not be heard. (Tr. 198-200, 204). The two men then rummaged through the apartment looking for anything else to take. Mr. Lopez retrieved the gloves and the weapons and put them back in his bag, which he then discarded a few blocks away from the apartment building. (*Id.* at 201-04, 207). The two then took the subway back to Ms. Olivera's apartment. En route, they were advised by Ms. Olivera that "the pot [was] looking low" — the proceeds of the robbery were less than had been anticipated. (*Id.* at 208-09). At her apartment, Ms. Olivera displayed several sets of keys, a few outdated flip phones, and $88 in cash, the latter of which was split between Mr. Monge and Mr. Lopez. (*Id.* at 211-13).[3]

The beatings administered by Mr. Monge and Mr. Lopez to Mr. Klein's head resulted in numerous lacerations to Mr. Klein's scalp, many of which went straight down to the skull. (Tr. 456-57, 459-60). Mr. Klein also had

---

[3]     Mr. Lopez admitted later to his friend and marijuana distributor, Miguel Fernandez, that in fact the proceeds of the robbery had been approximately $5,000, and that Ms. Olivera had taken a larger portion of the proceeds. (Tr. 595-96, 600). Mr. Monge, however, appears not to have been given this information.

several abrasions, contusions, and incised wounds; various broken bones; and bleeding on the inside of his scalp and around his brain. (*Id.* at 461-63, 465). Ultimately, Mr. Klein died as a result of both the blunt force trauma to his head and the obstruction of his airway caused by the bandanna that had been stuffed into his mouth. (*Id.* at 467).

Two days later, Ms. Olivera and Mr. Lopez informed Mr. Monge of news reports that Mr. Klein had died after, and as a result of, the robbery. (Tr. 219-22). One month later, in June 2012, Mr. Monge was hospitalized after being shot several times in an unrelated incident. (*Id.* at 229-30). Ms. Olivera and Mr. Lopez visited Mr. Monge in the hospital, and Mr. Lopez in particular expressed concern that he and Mr. Monge had been accurately depicted in a police artist's sketch of the Klein assailants. (*Id.* at 232-33). The two agreed to "be low" and "stay out of police contact." (*Id.* at 235).

Mr. Monge returned to live with Ms. Olivera in late 2013, and Mr. Lopez was now a periodic visitor. (Tr. 237-38). Presumably unfazed by their prior experience, the three determined to rob a loan shark whom Mr. Lopez had robbed previously. (*Id.* at 239-40). The plan failed, however, when the intended victim realized that he was being pursued and ducked into a building. (*Id.* at 242-46).

## B.   Procedural Background

### 1.   Mr. Lopez's 2015 Criminal Case

In or about late 2014, Mr. Lopez reached out to Miguel Fernandez, looking for an opportunity to commit another, unrelated robbery. (Tr. 612).

Mr. Fernandez, who was by then working as a cooperating witness, began meeting with Mr. Lopez to discuss what in fact was a sting robbery. (*Id.* at 612-20). Several of their recorded conversations were played during Mr. Lopez's trial in the instant matter (*see, e.g.*, Government Exhibit ("GX") 105); in a portion that was not played for the jury, Mr. Lopez showed what he had learned from the Klein robbery by making a request for a silencer — which, he observed, would "kill everything" (Dkt. #107-1).

Mr. Lopez was arrested with several others on December 19, 2014, while making the final preparations for a home invasion robbery. (Revised Final Presentence Investigation Report ("PSR" (Dkt. #115)) ¶ 46). On January 5, 2015, Mr. Lopez was indicted with three others on Hobbs Act robbery, firearms, and narcotics charges. (*See* 15 Cr. 2 Dkt. #14). That case (the "2015 Case") was assigned to United States District Judge Colleen McMahon.

On June 12, 2015, Mr. Lopez entered a plea of guilty before United States Magistrate Judge James L. Cott to Count Two of the Indictment, which charged him with using, carrying, or possessing a firearm in connection with a crime of violence (namely, the charged Hobbs Act robbery conspiracy), in violation of 18 U.S.C. § 924(c)(1)(A)(i). The plea was subsequently accepted by Judge McMahon. (*See* 15 Cr. 2 Dkt. #45). On November 18, 2015, Judge McMahon sentenced Mr. Lopez principally to the mandatory minimum term of imprisonment of 60 months. (*See* 15 Cr. 2 Dkt. #78 (transcript), 73 (judgment)).

## 2.     The Instant Prosecution, Trial, and Sentencing

While Mr. Lopez was serving his sentence in the 2015 Case, Mr. Monge was arrested pursuant to a criminal complaint on March 3, 2016.  (Dkt. #1). Mr. Monge subsequently pleaded guilty before this Court to an information charging him with racketeering, firearms, narcotics, and Hobbs Act robbery offenses.  (Dkt. #132).  On December 8, 2016, a superseding indictment was filed charging Mr. Lopez and Ms. Olivera with conspiracy to commit Hobbs Act robbery and with the substantive offense of Hobbs Act robbery, both in violation of 18 U.S.C. § 1951.  (Dkt. #22).

Trial as to Mr. Lopez and Ms. Olivera began on October 23, 2017, and concluded on November 2, 2017, when both defendants were convicted of both of the Hobbs Act robbery charges.  (Dkt. #77 (verdict form)).  The evidence at trial included testimony from Mr. Klein's family, as well as law enforcement and accomplice witnesses; physical evidence recovered from Mr. Klein's apartment; video surveillance footage of the defendants on the night of the robbery; and expert medical testimony concerning the causes of Mr. Klein's death.  (*See generally* Dkt. #78, 80, 82, 84, 86, 88, 90, 92 (trial transcripts)).  Neither defendant filed any post-trial motions.

In anticipation of Mr. Lopez's sentencing, the Probation Office prepared a Presentence Investigation Report.  (PSR).[4]  According to the Probation Office's analysis of his exposure under the United States Sentencing Guidelines

---

[4]     The PSR was adopted in part and modified in part by the Court at sentencing.  For this reason, the Court cites in this motion to the Revised Final Presentence Investigation Report.  (Dkt. #115).

7

("U.S.S.G." or the "Guidelines"), Mr. Lopez had an offense level of 43; 43 is the highest offense level in the Guidelines table, and specifies an advisory sentence of life imprisonment irrespective of the defendant's criminal history category. (PSR ¶ 41). However, because the aggregate statutory maximum of the counts of conviction was 480 months' (or 40 years') imprisonment, that figure became the applicable Guidelines sentence. (*Id.* ¶ 92 (citing U.S.S.G. § 5G1.2(b))).

The Probation Office recommended a sentence of 480 months' imprisonment, citing "the heinous and violent nature of the instant offense." (PSR p. 29, Sentencing Recommendation; *see also id.* ("It should be noted that had Lopez and his cohorts been charged and convicted for murder, they would be required to serve a life sentence.")). Mr. Lopez then filed a sentencing submission in which he requested a downward variance from the Guidelines. (Dkt. #105; *see also* Dkt. #109 (supplemental sentencing submission)). The Government filed a responsive submission in which it requested a Guidelines sentence. (Dkt. #107).

Sentencing took place on June 26, 2018. (Dkt. #120 (transcript)). At the beginning of the proceeding, the Court discussed with the parties the proper calculation of Mr. Lopez's criminal history category and the degree to which the sentence should run currently with or consecutively to the sentence imposed by Judge McMahon. (*Id.* at 4-8, 10). After hearing the Government's main sentencing presentation, the Court also heard from several of Mr. Klein's family members. (*Id.* at 11-33). The Court then heard from Mr. Lopez's counsel and from Mr. Lopez. (*Id.* at 33-44).

After adjourning to consider the parties' written and oral submissions, the Court imposed sentence.  While accepting the defense position that the killing of Mr. Klein had not been premeditated, the Court identified "a recklessness, maybe almost a disregard for what might happen.  I will not ever process fully why the conduct had to be so brutal, so dehumanizing." (Dkt. #120 at 47).  The Court was further troubled by the fact that, shortly after learning that his beating of Mr. Klein had resulted in the latter's death, Mr. Lopez sought to obtain a silencer in connection with a different planned robbery.  (*Id.* at 47-48 ("And all I can think of is just at some point life just became less valuable to Mr. Lopez, or that he became more comfortable or less uncomfortable taking the lives of other people.")).  The Court concluded its review of the factors contained in 18 U.S.C. § 3553(a) with the following observations:

> I'm aware of the parsimony provision in this case.  I am aware that there is another sentence that Mr. Lopez is serving.  I am aware that there is still time on that.  And I don't believe, based on the research that I've done, that I have the ability to order this sentence to run concurrently with that sentence. And so what I've been thinking about is whether it is appropriate for me to adjust this sentence because of the existence and continued time on that sentence.  And ultimately after thinking about it for quite [a while], I've decided I'm not going to do that.  I think this conduct is too egregious, and I think — I don't see that there is anything gained — as hard as I've tried to pore over the 3553(a) factors, I do not think a reduction of sentence is warranted.

(*Id.* at 48).

3.    **Mr. Lopez's Appeal and Collateral Challenges in the Instant Case**

Mr. Lopez appealed his conviction to the United States Court of Appeals for the Second Circuit, principally challenging this Court's rulings under Federal Rule of Evidence 404(b) that permitted the introduction of evidence that (i) Mr. Lopez and Mr. Monge had dealt marijuana while living in Ms. Olivera's apartment; (ii) Miguel Fernandez had sold drugs to Mr. Lopez for resale; and (iii) Mr. Lopez had discussed the Klein robbery in recorded conversations with Mr. Fernandez.  The Second Circuit found no error in this Court's evidentiary rulings, and upheld Mr. Lopez's conviction.  *United States* v. *Olivera*, 797 F. App'x 40, 45-46 (2d Cir. 2019) (summary order), *cert. denied sub nom. Lopez* v. *United States*, 140 S. Ct. 1228 (2020).

In 2020, Mr. Lopez moved for disclosure of certain grand jury materials and for surrender of his case file.  (*See generally* Dkt. #138, 140-146).  In January 2021, Mr. Lopez requested permission to file a "placeholder" motion under 28 U.S.C. § 2255 (Dkt. #147), which request the Court denied (Dkt. #152).  Mr. Lopez then filed a *pro se* Section 2255 motion that was received by the Court on March 1, 2021.  (Dkt. #154).  Two weeks later, the Court appointed Michael W. Martin of Lincoln Square Legal Services, Inc., to assist Mr. Lopez with his Section 2255 motion pursuant to the Criminal Justice Act. (Dkt. #158).[5]  Mr. Lopez filed a counseled supplemental brief on November 12, 2021 (Dkt. #166); the Government filed its opposition brief on March 4, 2022

---

[5]    The Court extends its appreciation to Mr. Martin and his team at Lincoln Square Legal Services for their thoughtful submissions in this case.

(Dkt. #171); and Mr. Lopez filed a counseled reply submission on April 1, 2022 (Dkt. #174).

## DISCUSSION

### A.    Overview

In the *pro se* component of his Section 2255 motion, Mr. Lopez raises claims of ineffectiveness of counsel on the part of both trial and appellate counsel.  (Pet. Br. 5-6).  In particular, Mr. Lopez claims that trial counsel Kenneth Montgomery failed to investigate certain video surveillance footage introduced during his trial; failed to seek a continuance of Mr. Lopez's trial and/or sentencing so that he could challenge his prior conviction in the 2015 Case; and failed to make certain sentencing arguments.  (*Id.*).  Mr. Lopez further claims that appellate counsel Arza Feldman failed to challenge the manner in which the video surveillance footage had been introduced at trial and failed to raise certain sentencing arguments.  (*Id.*).  In his supplemental submission, Mr. Lopez's counsel expands upon one of his sentencing arguments to seek resentencing in light of the intervening vacatur of his conviction in the 2015 Case.  After outlining the relevant law, the Court addresses the *pro se* arguments first, and then the counseled arguments.

11

## B.    Applicable Law

### 1.    Motions Under 28 U.S.C. § 2255[6]

A prisoner in federal custody may seek to have his sentence vacated, set aside, or corrected on the grounds that it "was imposed in violation of the Constitution or laws of the United States, or that the [trial] court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack[.]"  28 U.S.C. § 2255(a).  However, the grounds for such a collateral attack under Section 2255 are much more limited than those available on a direct appeal. *See United States* v. *Addonizio*, 442 U.S. 178, 185 (1979).  Relief may lie "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'"  *United States* v. *Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (quoting *Hill* v. *United States*, 368 U.S. 424, 428 (1962)); *accord Cuoco* v. *United States*, 208 F.3d 27, 30 (2d Cir. 2000).

"It is well established that a § 2255 petition cannot be used to 'relitigate questions which were raised and considered on direct appeal.'"  *United States* v. *Sanin*, 252 F.3d 79, 83 (2d Cir. 2001) (quoting *Cabrera* v. *United States*, 972 F.2d 23, 25 (2d Cir. 1992)); *accord United States* v. *Natelli*, 553 F.2d 5, 7 (2d Cir. 1977) ("[O]nce a matter has been decided adversely to a defendant on direct appeal it cannot be relitigated in a collateral attack[.]").  The sole

---

[6]    Caselaw in this area uses the terms "movant," "petitioner," and "defendant" interchangeably.

exception is when "there has been an intervening change in the law and the new law would have exonerated a defendant had it been in force before the conviction was affirmed on direct appeal."  *Chin* v. *United States*, 622 F.2d 1090, 1092 (2d Cir. 1980).  Section 2255 also precludes a defendant from bringing claims for the first time that could have been raised on direct appeal. *See Bousley* v. *United States*, 523 U.S. 614, 622-23 (1998).  Where the petitioner has procedurally defaulted on a claim by failing to raise it on direct appeal, the claim may be raised pursuant to Section 2255 only if the petitioner can demonstrate (i) cause for the failure to raise the claim and prejudice from the alleged error, or (ii) actual innocence of the crime.  *Id.*; *see also Murray* v. *Carrier*, 477 U.S. 478 (1986).

Generally speaking, a Section 2255 motion requires a hearing unless files and records conclusively show that the movant is entitled to no relief.  *See* 28 U.S.C. § 2255(b); *see also Pham* v. *United States*, 317 F.3d 178, 184 (2d Cir. 2003).  That said, the filing of a Section 2255 motion does not automatically entitle the movant to a hearing, as, for example, in instances in which a movant's allegations are "vague, conclusory, or palpably incredible." *Machibroda* v. *United States*, 368 U.S. 487, 495 (1962).  Rather, it is within the district court's discretion to determine the scope and nature of a hearing. *Chang* v. *United States*, 250 F.3d 79, 85-86 (2d Cir. 2001) ("It was, therefore, within the district court's discretion to choose a middle road [requiring a detailed affidavit from counsel] that avoided the delay, the needless expenditure of judicial resources, the burden on trial counsel and the government, and

13

perhaps the encouragement of other prisoners to make similar baseless claims that would have resulted from a full testimonial hearing.").

### 2. Ineffectiveness Claims on Collateral Review

In order to succeed on a claim of ineffective assistance of counsel, a movant must meet the two-pronged test established by *Strickland* v. *Washington*, 466 U.S. 668 (1984). *First*, the movant must show that his counsel's representation was deficient, falling below the objective standard of reasonableness. *See id.* at 687-88. During this first step, the standard of review is highly deferential and includes "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. "This presumption is overcome only if counsel failed to act reasonably considering all of the circumstances." *United States* v. *Rosemond*, 958 F.3d 111, 121 (2d Cir. 2020).

*Second*, the movant must establish that his counsel's errors resulted in actual prejudice. *See Strickland*, 466 U.S. at 694. A movant satisfies this second prong by proving that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*; *see also United States* v. *Nolan*, 956 F.3d 71, 79 (2d Cir. 2020). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Garner* v. *Lee*, 908 F.3d 845, 862 (2d Cir. 2018).

A court is not required to address *Strickland*'s elements in any particular order. *See Strickland*, 466 U.S. at 697. If the movant does not successfully

establish either the performance prong or the prejudice prong, the entire claim fails, and the remaining, unaddressed step becomes moot. *See id.*

## C.    Analysis

### 1.    Mr. Lopez Received the Effective Assistance of Counsel at Trial and on Appeal[7]

#### a.    Trial Counsel Did Not Err With Respect to the Video Surveillance Footage

The Court begins, as Mr. Lopez did, with his challenge to trial counsel's failure to hire a private investigator and/or video footage expert to examine the surveillance video taken of the hallway that included Mr. Klein's apartment. (Pet. Br. 5). The specifics of his complaint include arguments that the footage did not belong to building management, but rather had been recorded by a hidden camera; that it had been edited for trial; and that trial counsel had failed to introduce footage of three men entering into Mr. Klein's apartment before the police arrived. (*Id.*).

This Court finds neither ineffectiveness nor prejudice on this record. The stipulation introducing the video footage made clear that (i) the clips admitted into evidence were recorded by a camera that had been hidden inside of a vent by one of Mr. Klein's neighbors, and (ii) the Government was introducing excerpts from a larger recording. (Tr. 145-47; GX 2000 (stipulation)). Mr.

---

[7]    The Government has not argued procedural default in its opposition, and therefore the Court proceeds to consider the merits of Mr. Lopez's claims. *See generally Trest* v. *Cain*, 522 U.S. 87, 89 (1997) (noting that a court "is not required to raise the issue of procedural default *sua sponte*," because "procedural default is normally a defense that the [Government] is obligated to raise and preserve if it is not to lose the right to assert the defense thereafter" (internal quotation marks and brackets omitted)).

Monge then explained to the jury why the clips were relevant by identifying himself, Mr. Lopez, and Ms. Olivera from the surveillance footage recorded on May 12, 2012.  (Tr. 223-29).  Given Mr. Monge's extensively detailed (and corroborated) account of the robbery and murder of Mr. Klein, this Court will not say that trial counsel was ineffective in not introducing *other* excerpts from the surveillance footage at trial that showed other people entering the apartment.  Similarly, given the overwhelming evidence of his guilt introduced at trial, Mr. Lopez has not and cannot explain how trial counsel failed with respect to his investigation of the video footage, or how trial counsel's failure to introduce additional video footage could have prejudiced Mr. Lopez at trial.

### b.    Trial Counsel Did Not Err in Failing to Seek a Continuance of Mr. Lopez's Trial or Sentencing

Mr. Lopez similarly fails to identify ineffectiveness in trial counsel's decision not to seek a continuance of his trial until after the resolution of Mr. Lopez's Section 2255 motion in the 2015 Case.  (Pet. Br. 5-6).  By way of background, Mr. Lopez filed that motion on November 21, 2016, nearly one year before the start of trial in the instant case.  However, in September 2017, Mr. Lopez himself requested that the matter be placed in abeyance while he considered amendments.  (15 Cr. 2 Dkt. #89).  Thereafter, in November 2017, the Government sought and obtained an adjournment of its response pending the Second Circuit's consideration of claims analogous to those raised by Mr. Lopez.  (*See, e.g.*, 15 Cr. 2 Dkt. #94).

In August 2018, after waiting for guidance from the Second Circuit for nearly 20 months, Judge McMahon ordered a response from the Government.

(15 Cr. 2 Dkt. #109). In January 2019, Judge McMahon denied Mr. Lopez's motion. (15 Cr. 2 Dkt. #117). The Second Circuit initially dismissed Mr. Lopez's appeal, but then reinstated it in August 2019, after the Supreme Court's decision in *United States* v. *Davis*, 139 S. Ct. 2319 (2019), found the residual clause of 18 U.S.C. § 924(c)(3)(B) to be unconstitutionally vague. (15 Cr. 2 Dkt. #122 (mandate)). In May 2020, Judge McMahon vacated Mr. Lopez's conviction with the Government's consent. (15 Cr. 2 Dkt. #133).

The vacatur of Mr. Lopez's conviction in the 2015 Case would not have impacted the conduct of the trial in the instant case. While the Court admitted testimony from and recordings involving Miguel Fernandez that touched on statements made by Mr. Lopez about the Klein robbery, it did not permit the jury to learn of Mr. Lopez's conviction in that case. Accordingly, there was no error in trial counsel's failure to seek an adjournment of indeterminate length of Mr. Lopez's trial, particularly where there was a co-defendant with her own Sixth Amendment rights. Similarly, there was no error in trial counsel's failure to seek an adjournment of the sentencing date, given the fact that Mr. Lopez's Section 2255 motion in the 2015 Case was then in a state of limbo.[8] There was, in short, neither ineffectiveness nor prejudice in counsel's failure to request an adjournment.

---

[8]     Additionally, as discussed *infra*, any vacatur of the conviction in the 2015 Case would not have caused this Court to impose a different sentence.

###### c. Trial Counsel Did Not Err at Sentencing

Finally, Mr. Lopez claims that trial counsel erred at sentencing by not seeking a merger of or concurrent sentences on Counts One and Two, and by not objecting to the calculation of the Guidelines. (Pet. Br. 6). But the Government's responses to these claims are entirely correct, and the purported errors identified by Mr. Lopez were in fact correct applications of the advisory Guidelines. (Gov't Opp. 13-14).

The law is clear that conspiracy to commit Hobbs Act robbery and the substantive offense of Hobbs Act robbery are separate offenses; there was, accordingly, no prohibition on the Court imposing consecutive sentences on the two counts of conviction. *See Callanan* v. *United States*, 364 U.S. 587, 593-94, 597 (1961) (finding that convictions under both conspiracy and substantive provisions of Hobbs Act are not multiplicitous and can be basis for consecutive sentences); *see also United States* v. *Feola*, 420 U.S. 671, 693 (1975) ("[C]onsecutive sentences may be imposed for the conspiracy and for the underlying crime."); *United States* v. *Rosa*, 17 F.3d 1531, 1543 (2d Cir. 1994) ("Conspiracy is a crime that is separate and distinct from the substantive offense that is the object of the conspiracy."). And as the Government observed, the Probation Office and this Court appropriately treated the two counts of conviction as a single group, such that U.S.S.G. § 3D1.4 was not implicated. (Gov't Opp. 13-14).

Mr. Lopez's challenge to the cross-reference provision in U.S.S.G. § 2A1.1 is similarly misplaced. (Pet. Br. 6). Section 2B3.1 of the Guidelines, which

addresses robbery offenses, specifies that "[i]f a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States, apply § 2A1.1 (First Degree Murder)."  U.S.S.G. § 2B3.1(c)(1).  The killing of Mr. Klein during a robbery constitutes felony murder, which, in turn, constitutes murder under federal law.  *See* 18 U.S.C. § 1111(a) ("Murder is the unlawful killing of a human being with malice aforethought.  Every murder ... committed in the perpetration of, or attempt to perpetrate ... robbery ... is murder in the first degree.").  The cross-reference to U.S.S.G. § 2A1.1 was therefore warranted.

### d.   Mr. Lopez Received the Effective Assistance of Counsel on Appeal

Separately, Mr. Lopez claims ineffective assistance on the part of appellate counsel, who purportedly failed to identify and challenge on appeal the above-described errors attributed to trial counsel.  (Pet. Br. 5-6).  The ineffectiveness standard for appellate counsel under Section 2255 is slightly different:  To prevail on such a claim, the defendant must prove both that his counsel's failure to raise an issue was objectively unreasonable and that there is a reasonable probability the outcome of the appeal would have been different if the issue had been raised.  *See Mayo* v. *Henderson*, 13 F.3d 528, 533 (2d Cir. 1994).  Ineffectiveness may be shown if appellate counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker."  *Id.*  As the Court's analysis confirms, trial counsel did not commit the

errors ascribed to him by Mr. Lopez.  By extension, appellate counsel was not ineffective in failing to raise these claims on appeal.

> ### 2.  The Vacatur of Mr. Lopez's Conviction in the 2015 Case Does Not Warrant Resentencing in This Case

In his counseled supplemental submission, Mr. Lopez argues for resentencing in light of the 2020 vacatur of his conviction under 18 U.S.C. § 924(c)(1)(A)(i) in the 2015 Case.  In this regard, Mr. Lopez argues that he is entitled to be sentenced "based upon an accurate record, one reflecting that he has no prior convictions."  (Pet. Supp. Br. 1; *see also id.* at 6 ("Mr. Lopez's vacated 2015 conviction is grounds for a reconsidered sentence in this present case under 28 U.S.C. § 2255, as there was a legal error of constitutional dimension in the understanding of the substantive law at his sentencing.")).  The Government disagrees, arguing that the conviction had no impact on the applicable Guidelines range in this case and, more broadly, that the vacatur did not have an impact (constitutional or otherwise) on the sentence imposed by this Court.  (Gov't Opp. 15-17).  As explained in the remainder of this section, the Court will not resentence Mr. Lopez.

Since briefing on the instant motion concluded, the Second Circuit has provided guidance in several potentially related areas.  *First*, the Court found that the Supreme Court's holding in *Davis* represented a new substantive rule of constitutional criminal law that applied retroactively to cases on collateral review.  *Hall* v. *United States*, 58 F.4th 55 (2d Cir. 2023).  *Second*, the Court addressed the discretion afforded to district courts with respect to sentencing a

defendant after the vacatur of a count of conviction on a collateral challenge. *United States* v. *Peña*, 58 F.4th 613 (2d Cir. 2023).

The defendant in *Peña* had been convicted of three counts of murder for hire and/or conspiracy to commit murder for hire under 18 U.S.C. § 1958, and two counts of using a firearm to commit murder during a crime of violence (specifically, the aforementioned conspiracy to commit murder for hire) under 18 U.S.C. § 924(j), for which he was sentenced to five concurrent terms of life imprisonment.  *Peña*, 58 F.4th at 615-16.  After *Davis* was issued, the district court vacated the two Section 924(j) counts, but determined that a *de novo* resentencing was not appropriate because the remaining counts also specified terms of life imprisonment.  Peña appealed from the district court's decision, arguing that resentencing was mandatory and, in the alternative, that the district court had abused its discretion in not resentencing him *de novo.*  The Second Circuit disagreed on both counts.

After reviewing the options set forth in Section 2255(b), which includes vacatur and sentence correction in addition to resentencing, the Second Circuit distinguished the case from prior decisions in which the Circuit had found that a *de novo* sentencing was required after a count of conviction was vacated on direct appeal.  58 F.4th at 619 ("While the default rule in *Rigas* may apply whenever a conviction is reversed on direct appeal, § 2255's plain text, which vests district courts with discretion to select the appropriate relief from a menu of options, precludes us from applying the *Rigas* default rule to all cases that arise in the § 2255 context." (citing *United States* v. *Rigas*, 583 F.3d 108, 115-

16 (2d Cir. 2009), and *United States* v. *Quintieri*, 306 F.3d 1217 (2d Cir. 2002))).  What is more, having found that judges had such discretion in the Section 2255 context, the Second Circuit found that the district court had not abused its discretion in declining to resentence Peña *de novo.  Id.* at 621-23; *accord United States* v. *Ayyad*, No. 20-3832, 2023 WL 1975682, at *1 (2d Cir. Feb. 14, 2023) ("In light of our holding in *Peña*, the district court was not required to conduct *de novo* resentencing after vacating Ayyad's conviction on Count Ten.  When, as here, a conviction is vacated by the district court after a successful habeas challenge, § 2255 vests district courts with discretion to select the appropriate relief from a menu of options[.]" (internal quotations marks and citation omitted)).[9]

Significantly, the *Peña* and *Ayyad* decisions involved situations in which the defendant sought resentencing after obtaining the vacatur of one of the counts of conviction.  The instant case has a procedural posture one step removed from that analysis:  The two counts of which Mr. Lopez was convicted

---

[9]    The *Peña* Court noted, however, that it was not purporting to issue a bright-line ruling regarding the discretion of district courts:

> As noted in our discussion of [*United States* v. *Augustin*, 16 F.4th 227 (6th Cir. 2021), *cert. denied*, 142 S. Ct. 1458 (2022),] above, a district court's discretion to not conduct a *de novo* resentencing has limits.  It may be that in most cases in which resentencing would not be strictly ministerial, a district court abuses its discretion when it denies *de novo* resentencing.  But we need not and do not attempt today to define the circumstances under which a district court abuses its discretion in denying *de novo* resentencing.  It is enough, in light of the facts of the case at bar, to conclude only that a district court may properly deny *de novo* resentencing when the exercise would be an empty formality, as it would be here.

*United States* v. *Peña*, 58 F.4th 613, 623 (2d Cir. 2023).

remain valid, and what was vacated was a count that only impacted the calculation of his criminal history.  A different line of Second Circuit precedent addresses this situation.

In *United States* v. *Hoskins*, 905 F.3d 97 (2d Cir. 2018), the defendant had entered a guilty plea to a charge of distributing cocaine base pursuant to a binding Rule 11(c)(1)(C) plea agreement.  The agreement specified a sentence of 112 months' imprisonment, which was below the relevant Guidelines range if Hoskins were determined to be a career offender under U.S.S.G. § 4B1.1, but within the relevant Guidelines range if he were not a career offender.  905 F.3d at 100.[10]  After his sentencing, Hoskins obtained a vacatur of one of his prior convictions based on errors in the plea colloquy.  *Id.*  Thereafter, he sought resentencing in the federal case, arguing that his "'sentence was driven by the fact that the Court determined that [he] qualified as a career offender based on his prior federal conviction as well as a Vermont state conviction,' a determination rendered invalid by the vacatur of the Vermont conviction."  *Id.* at 101.  The district court agreed and resentenced him to a term of 86 months' imprisonment.  The Government appealed, and the Second Circuit vacated the sentence and remanded the matter for reimposition of the original sentence.

Citing Supreme Court precedent, the Second Circuit observed that "an error of law does not provide a basis for collateral attack unless the claimed

---

[10]    At the time of sentencing, the defendant had both a prior Vermont drug conviction and a prior federal drug conviction.  *See United States* v. *Hoskins*, 905 F.3d 97, 100 (2d Cir. 2018).  He later obtained vacatur of the state conviction.  This Court's reference in the text to the "federal case" refers to the case that was resolved by the Rule 11(c)(1)(C) plea agreement and addressed by the Second Circuit in its opinion.

error constituted 'a fundamental defect which inherently results in a complete miscarriage of justice.'"  905 F.3d at 102 (quoting *Addonizio*, 442 U.S. at 185 (citation omitted in *Hoskins*)).  It then proceeded to find that "[t]he district court erred in concluding that, after vacatur of Hoskins's 2002 Vermont conviction, the 112-month sentence entered pursuant to the parties' Rule 11(c)(1)(C) plea agreement constituted a miscarriage of justice."  *Id.* at 103.

The Second Circuit noted that at the time the district court initially sentenced Hoskins, application of the career offender enhancement "was not error — constitutional, legal, or jurisdictional."  905 F.3d at 103.  It then concluded that Hoskins's subsequent vacatur of his state conviction "did not affect the lawfulness of the judgment itself."  *Id.* (quoting *Addonizio*, 442 U.S. at 186).  On this point, the Court reasoned that (i) the plea agreement specified a sentence below the career offender Guidelines range and (ii) the Guidelines range in any event would have been advisory and not mandatory.  *Id.* at 104;[11]

---

[11]    Indeed, the Second Circuit found that the district court's acknowledged consideration of the defendant's career offender status at the time of sentencing was not a basis for Section 2255 relief:

> The district court thought it permissible to re-open Hoskins's 112-month sentence on collateral review because it had considered Hoskins's career offender status at the time of sentencing.  That reasoning, however, ignores § 2255 jurisprudence, requiring more than a mistake of fact or law to justify collateral relief from a final sentencing judgment.  *See* [*Davis* v. *United States*, 417 U.S. 333, 346 (1974)].  That is especially so here, where Hoskins's challenged 112-month sentence falls in the middle of a corrected non-career offender Guidelines range.  Nor is Hoskins's § 2255 motion cognizable because the district court may not have accepted the parties' Rule 11(c)(1)(C) plea agreement had it known that the 2002 Vermont drug conviction would not stand.  Although the underlying prosecution and sentencing were before [the district court], frustration of a sentencing judge's subjective intent does not, by itself, render a sentence a miscarriage of justice sufficient

*cf. Reed* v. *United States*, 779 F. App'x 47, 48 (2d Cir. 2019) (summary order) (vacating order denying Section 2255 motion where sentence imposed was in excess of post-vacatur Guidelines range, observing that "in imposing the sentence, the District Court may have been influenced by sentencing benchmarks that were either erroneously calculated at the time or that have been altered by subsequent events"); *see generally Sun Bear* v. *United States*, 644 F.3d 700, 706 (8th Cir. 2011) ("[I]n sentencing, a miscarriage of justice cognizable under § 2255 occurs when the sentence is in excess of that authorized by law.").

Mr. Lopez contends that *Hoskins* in inapplicable to this setting, because the error at issue is one of a constitutional dimension.  (Pet. Reply 3-4).  This Court is skeptical.  To be sure, the vacatur of Mr. Lopez's conviction in the 2015 Case was a recognition of the constitutional infirmities of that conviction.  But that constitutional error did not infect the instant case, where the vacated conviction did not affect the Guidelines range and did not, in and of itself, impact the Court's sentencing decision.  That said, regardless of whether Mr. Lopez's claim for resentencing is considered under *Hoskins* or under *Peña*, the Court does not believe that resentencing is appropriate in this case.

To review, Mr. Lopez engaged in a felony murder of Miles Klein that was as shocking for its senselessness as for its brutality.  Though he professed to

---

to support a cognizable collateral challenge to that sentence.  *See Addonizio*, 442 U.S. at 187[.]

*United States* v. *Hoskins*, 905 F.3d 97, 105 (2d Cir. 2018).

be surprised when Mr. Klein died from his injuries, Mr. Lopez was not "scared straight" by the death.  To the contrary, after laying low for a few months, Mr. Lopez proposed to Mr. Monge and Ms. Olivera that they engage in a robbery of a loan shark whom Mr. Lopez had acknowledged robbing previously.  Only the fortuity that the conspirators were "made" by the loan shark prevented another violent robbery.  Even then, Mr. Lopez was undeterred, soliciting still another robbery opportunity from Miguel Fernandez, where he purported to learn from his prior mistakes by seeking a silencer, which he understood — and intended — would "kill everything."  (Dkt. #107-1).  At sentencing, Mr. Lopez was notably lacking in remorse for his conduct; while gesturing at the trauma suffered by the Klein family, Mr. Lopez emphasized that he and his family were also suffering, and that he "just want[ed] to move past all this and move forward."  (Dkt. #120 at 44).

Mr. Lopez's Guidelines offense level was 43, which specified a life sentence at any criminal history category.  Had there been a count of conviction for which the maximum term of imprisonment was life, the Court would seriously have considered such a sentence under all of the circumstances of this case.  But the Guidelines sentence became the aggregate statutory maximum of 480 months, and that was and remains the appropriate sentence.  Mr. Lopez and his counsel argue that he has a "constitutional right to be sentenced on a correct and accurate factual record."  (Pet. Reply 4 (citing *United States* v. *Tucker*, 404 U.S. 433, 448-49 (1972))).  For avoidance of doubt, to the extent that this Court considered Mr. Lopez's 2015 Case in determining

an appropriate sentence, it did *not* consider the fact of his prior conviction, but rather the underlying recordings evidencing Mr. Lopez's proactive solicitation and planning of an armed robbery. Nothing about the vacatur of the conviction in the 2015 Case changes the fact that Mr. Lopez volunteered those statements after the Klein felony murder. And, quite unlike the *Tucker* case on which Mr. Lopez relies, the instant case involves neither a "sentence founded at least in part upon misinformation of constitutional magnitude," 404 U.S. at 447, nor a situation in which "the factual circumstances of the respondent's background would have appeared in a dramatically different light at the sentencing proceeding," *id.* at 448.

There is one aspect in which this Court considered the fact of Mr. Lopez's conviction in the 2015 Case, and that occurred in the context of determining whether to run the instant case concurrently with or consecutively to the sentence imposed by Judge McMahon, and, relatedly, whether to vary downwardly from the Guidelines range to the extent that a consecutive sentence was required. (Dkt. #120 at 48-49). This Court intended to impose a 40-year sentence for the offenses of conviction, but not a 45-year sentence, and it was briefly concerned that the vacatur of Mr. Lopez's conviction in the 2015 Case after it had been fully served would effectively result in a 45-year sentence in this case. The Court has confirmed with the Bureau of Prisons ("BOP") that, because of the vacatur, Mr. Lopez has received credit against the sentence in the instant case for all of the time that he has served since his initial arrest and detention on December 19, 2014.

**CONCLUSION**

For the reasons set forth above, the Court DENIES Mr. Lopez's motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.  The Court issues a certificate of appealability and grants *in forma pauperis* status only with respect to Mr. Lopez's counseled claim for resentencing, and not with respect to his claims of ineffective assistance.  *See* 28 U.S.C. §§ 2253(c), 1915(a)(3).

The Clerk of Court is directed to file this Opinion in both Case Nos. 16 Cr. 323-2 and 21 Civ. 1858, to terminate the motion pending at docket entry 154 in Case No. 16 Cr. 323-2, and to close Case No. 21 Civ. 1858.

SO ORDERED.

Dated:   April 17, 2023
         New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

28